**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

BARBARA J. HARPER, et al.,

Plaintiffs,

v. CIVIL ACTION NO. 2:09-cv-00973

UNITED STATES OF AMERICA,

Defendant.

**MEMORANDUM OPINION AND**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

*I. INTRODUCTION AND PROCEDURAL HISTORY*

Plaintiffs bring this medical malpractice action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-80. Plaintiffs' claims, which allege medical negligence under West Virginia's Medical Professional Liability Act (MPLA), W. Va. Code §§ 55-7B-1 *et seq.*, and loss of consortium, arise out of Plaintiff Barbara Harper's treatment by Dr. John P. McMurry on December 20, 2005. At all relevant times, Dr. McMurry was employed by Roane County Family Health Care Inc. (Family Health), a federally-funded health care provider in Spencer, West Virginia. Employees of Family Health are deemed to be federal employees under 42 U.S.C. § 233. Thus, this Court has jurisdiction and venue is proper in this Court. 28 U.S.C. § 1346(b)(1)). Plaintiffs seek damages for medical expenses, lost wages, non-economic damages including loss of consortium and other compensatory damages.

After exhausting their administrative remedies as required by 28 U.S.C. § 2401(b), Plaintiffs filed their Complaint in the Circuit Court of Jackson County, West Virginia, on April 27, 2009. The

Government then removed the action to this Court on August 28, 2009. On September 28, 2011, the Court entered a Memorandum Opinion and Order [Docket 100] denying Defendant's motion for summary judgment. Pursuant to 28 U.S.C. § 2402, this matter was tried to the Court without a jury on October 5, 2010. In accordance with Fed. R. Civ. P. 52(a)(1), the Court now makes its findings of fact and conclusions of law.

*II. PRELIMINARY FINDINGS OF FACT AS TO MEDICAL HISTORY*

1. On December 20, 2005, Plaintiff Barbara Harper underwent a total abdominal hysterectomy at Jackson General Hospital in Ripley, West Virginia. Dr. McMurry performed the surgery and removed Mrs. Harper's left ovary and tube, right tube, and uterus. On December 21, 2005, Mrs. Harper's vital signs were stable and she had minimal vaginal bleeding. At 12:59 p.m. on that day, Dr. McMurry's progress note indicates that Mrs. Haper was "feeling fine, though hurting." The next day, Mrs. Harper complained about soreness around the incision. (Joint Trial Ex. 3.) Dr. McMurry described the procedure in his December 20, 2005 operative report: "Careful search was made for bleeding. None was found . . . The patient tolerated the procedure well." (Plaintiff Trial Ex. 4.)

2. On December 23, 2005, Mrs. Harper was taken to surgery with Dr. McMurry and Dr. Vaidya for a right and left retrograde pyelogram, cystourethoscopy, and right ureteral exploration and re-implantation of the right ureter. (Joint Trial Ex. 3.) Dr. Vaidya performed the reimplantation and described the surgery in his operative report:

> [I]t appeared that the ureter was obstructed near the fornix of the vagina and multiple sutures were seen at this point. The sutures were removed. With extensive scarring and edema it did not appear that further dissection of the ureter was possible so the ureter was detached at this point and a large amount of urine was drained from the right kidney which appeared functioning. Subsequently the hemostasis was first secured and then an opening was made in the bladder where the re-implantation of the dome of the bladder was carried out.

(Plaintiff Trial Ex. 4.)

3. Dr. McMurry wrote a progress note on December 23, 2005, which included his recollection of the December 20, 2005 surgery. He wrote that he found the right ureter enlarged, but was not concerned about it because of Mrs. Harper's history of hydronephrosis. Dr. McMurry recalled that there was an unexpectedly large amount of bleeding/oozing. The possibility of a kinked ureter could not be ruled out. (Joint Trial Ex. 3.)

4. On November 24, 2006, Mrs. Harper was admitted by Dr. Zaslau to WVU Hospitals for a ureteral stent exchange. During that admission it was discovered that her right ureteric anastomosis was strictured with right sided hydronephrosis. A surgical exchange of the right ureter stent was performed on November 26, 2006. (Joint Trial Ex. 3.) Dr. Zaslau testified that the reason for this visit was related to Mrs. Harper's original ureteral injury on December 20, 2005. (Trial Tr. 119:17-25.)

5. Dr. Zaslau performed cystoscopy, retrograde pyelogram, and stent exchange on Mrs. Harper on December 18, 2006. The right ureter was found to be dilated all the way to the anastomotic site. Dr. Zaslau made the following operative findings:

> On cystoscopy, the bladder was within normal limits. The right ureteral orifice was not in the normal trigonal location along the ureteric ridge. It was displaced laterally. It was located at the junction of the posterior and right lateral wall. There was some inflammation noted around this orifice as a result of her stent. Retrograde pyelogram revealed a dilated ureter all the way to the anastomotic site. It was floppy and tortuous in areas. There was no filling defect identified. The calices were distended as well. On ureteroscopy, there was no mass lesions identified. There was no mass at the anastomotic site. The scope was able to be passed through the lumen with slight resistance; however, the patient did have a stent just prior to undergoing urteroscopy.

(Joint Trial Ex. 3.) He explained further at trial:

> Retrograde pyelogram, "retrograde" meaning backwards, "pyelogram" meaning evaluation of the kidney, is a dye study where dye is injuected into the ureter to identify the anatomy of the ureter and the collecting system within the kidney. And a stent exchange simply means that the stent that was previously placed was changed . . . . The reason we change them is because they can become encrusted with stone material and, because of that, they don't drain as well and, in other cases, they can become infected and the manufacturers for some stents don't want them in place for a longer period of time because some of them may calcify and have trouble being removed.

(Trial Tr. 110-11.)

6. On April 26, 2007, Mrs. Harper was admitted to WVU Hospitals by Dr. Zaslau for revision of the right distal ureteral stricture. She also had her remaining ovary removed due to a cyst. (Joint Trial Ex. 3.)

7. On June 8, 2009, Dr. Zaslau saw Mrs. Harper for a follow-up and reported that she was doing very nicely and about 50 percent better in terms of her original problems. A CT scan revealed mild right hydronephrosis.

*III. GENERAL CONCLUSIONS OF LAW*

8. The FTCA renders the Government liable for the negligent acts of its employees committed "while acting within the scope of [their] employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, because Plaintiffs allege that the purported negligence occurred in West Virginia, the Court is bound to apply West Virginia's substantive law, which, in cases such as this one involving medical negligence, is the MPLA. *See, e.g.*, *Osborne v. United States*, 166 F. Supp. 2d 479 (S.D. W. Va. 2001) (Haden, C.J.) (applying MPLA); *Bellomy v. United States*, 888 F. Supp. 760 (S.D. W. Va. 1995) (Haden, C.J.) (same).

9. The MPLA sets forth the elements of a medical negligence claim as follows:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3(a)(1)-(2).

10. Thus, to prevail on a claim under the MPLA, the burden is on the plaintiff to prove, by a preponderance of the evidence, that the defendant was negligent and that the negligence was a proximate cause of the plaintiff's injury. *Sexton v. Greico*, 216 W. Va. 714, 716, 613 S.E.2d 81, 83 (2005) (per curiam) (quoting syl. pt. 2, *Walton v. Given*, 158 W. Va. 897, 215 S.E.2d 647 (1975)).

11. A plaintiff is generally required to establish the applicable standard of care and breach thereof by use of expert testimony. W. Va. Code § 55-7B-7; *Bellomy*, 888 F. Supp. at 764; *but see Lutz v. Estate of Hillier*, 574 F. Supp. 1032, 1034 (S.D. W. Va. 1983) (Haden, C.J.) (allowing plaintiff to establish claim by calling defendant's experts as adverse witnesses and introducing their deposition testimony into the record). "Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997). The Court is not required to accept as true, and may afford proper weight to, expert testimony that is internally inconsistent or contradictory. *Holm v. United States*, 325 F.2d 44, 46 (9th Cir. 1963); *cf. Jones v. Heckler*, 614 F. Supp. 277, 280 (D. Vt. 1985) (disregarding medical expert's testimony as not probative of plaintiff's medical condition because testimony was internally inconsistent).

12. West Virginia has abolished the "locality rule," meaning that the standard of medical care is a national one. Syl. pt. 1, *Plaintiff v. City of Parkersburg*, 176 W. Va. 469, 345 S.E.2d 564 (1986).

*IV. FINDINGS OF FACT AS TO EXPERT TESTIMONY*

*A. Plaintiffs' Expert Testimony*

13. Plaintiff Barbara Harper's treating physician and expert witness, Dr. Zaslau, is a board certified urologist, professor, and the program director of the Urology Residency Program at West Virginia University. Plaintiff also admitted the deposition of Dr. Duncan, a board certified urologist.

*1. Dr. Zaslau*

14. Dr. Zaslau testified that Dr. McMurry was negligent because he did not identify and preserve Mrs. Harper's ureters intraoperatively. Dr. Zaslau stated that if Dr. McMurry had identified Mrs. Harper's ureters, then a note of the identification would have been included in Dr. McMurry's operative report. Further, Dr. Zaslau stated that because Mrs. Harper's injury was profound, that it would have been found if the ureters were identified during the initial surgery by Dr. McMurry. (Trial Tr. 131-34.)

15. Dr. Zaslau testified that it was below the standard of care to fail to identify intraoperatively the injury to Mrs. Harper's ureter. (Trial Tr. 135.)

16. It is Dr. Zaslau's opinion that if Dr. McMurry had identified the injury during the surgery, then there is a higher chance that Mrs. Harper would not have had less problems and would have required fewer procedures. (Trial Tr. 135-36.)

*2. Dr. Duncan*

17. Dr. Duncan stated that Dr. McMurry failed to meet the standard of care. He stated:

> My opinions are, one, that the ureter was not adequately identified prior to the surgical procedure, and that included identification of the ureter preoperatively with stenting and the possible need for urological consultation since it was known to be abnormal prior to the hysterectomy. And, two, during the hysterectomy procedure, the ureter was not identified at the initial portion of the procedure. And after the hysterectomy, the ureter was not identified to ascertain injury. And, also, since the injury to the ureter would have been identified at the time of the initial hysterectomy, the repair would have been more simple and the patient would not have required reimplant, would probably not have required either of the reimplantation procedures that were performed subsequently.

(Trial Plaintiff Ex. 7.)

18. Dr. Duncan also opined that Dr. McMurry should have included in his operative report that the ureters were traced out.

19. Dr. Duncan believes that if Dr. McMurry had identified the ureters intraoperatively, then he would have been able to have seen the injury. He believes the injury could have been dealt with at the time and that a urological consultation should have been made.

*B. Defendant's Expert Testimony*

20. Dr. McMurry was Mrs. Harper's treating physician and testified at trial. Dr. Griffin, a board certified obstetrician and gynecologist also testified at trial.

*1. Dr. McMurry*

21. Dr. McMurry is an obstetrician and gynecologist. During Mrs. Harper's surgery on December 20, 2005, Dr. McMurry injured Mrs. Harper's right ureter by either lacerating it or suturing it.

22. Dr. McMurry expressed that he was required to identify and protect the ureters during the surgery. He stated that he was required to trace the ureters before closing Mrs. Harper to make sure there was no ureter injury.

23. Dr. McMurry testified that he did identify the ureters introperatively. However, his operative report from the December 20, 2005 surgery does not mention that he identified or protected the ureters.

24. Dr. McMurry stated that Mrs. Harper's right ureter injury was possibly caused by a stitch. He also thought that it was possible that if the stitch had been removed in time, then Mrs. Harper might not have needed additional surgeries. However, he did believe that she would have had to have her ureter reimplanted.

25. Dr. McMurry does not believe that Mrs. Harper's outcome would have been different had the injury been discovered intraoperatively during the December 20, 2005 surgery.

26. During the exploratory surgery on December 23, 2005, Dr. McMurry observed that Mrs. Harper had urine in her abdominal cavity and that her ureter had separated.

*2. Dr. Griffin*

27. Defendants also called Dr. Griffin, who testified that Dr. McMurry's surgery on Barbara Harper on December 20, 2005 met the standard of care.

28. Dr. Griffin testified that it was not a deviation from the standard of care that Dr. McMurry did not include in his operative report that he identified the ureters. He also stated that it was appropriate for Dr. McMurry to include his memory of identifying the urters in the later progress note on December 23, 2005.

29. Dr. Griffin did not agree with Dr. Duncan that the standard of care would have been to identify the ureteral injury intraoperatively and repair it. Dr. Griffin stated that as many as 85 percent of ureteral injuries are not detected until after surgery. Thus, it is his opinion that doctors cannot be required to fix something that is undetectable.

30. Dr. Griffin did not agree with the other reasons that Dr. Duncan faulted Dr. McMurry. Dr. Griffin does not believe that Dr. McMurry was required to have a preoperative consult with a urologist. Also, he does not believe that Dr. McMurry was required to have a intraoperative urology consult when he found that the right ureter was slightly enlarged. Additionally, Dr. Griffin does not think that the ureters should have been stented preoperatively.

31. Finally, Dr. Griffin disagreed with Dr. Duncan regarding what would have happened if the ureteral injury had been found at the time of surgery. Dr. Duncan stated that if the injury would have been found during surgery, then Mrs. Harper would have needed a simple reanastomosis, not another reimplantation surgery. Dr. Griffin opined that there would be no way to predict what would have been required. He stated "the usual approach, more probably than not, would have been that when you have a low ureteral injury, reimplantation is required." (Trial Tr. 214:15-18.)

## *V. FINDINGS OF FACT WITH REGARD TO LIABILITY*

32. The Court will address each of Plaintiffs' theories in turn.

### *A. Failure to Identify Ureters*

33. Both parties' experts agreed that the standard of care required Dr. McMurry to identify the ureters intraoperatively. The Plaintiffs' experts opined that Dr. McMurry breached the standard of care because he did not identify the ureters. Dr. Zaslau and Dr. Duncan believed that Dr. McMurry

did not identify the ureters intraoperatively because he did not include it in his operative report on December 20, 2005. He testified:

> [T]he standard of care is to identify and preserve normal anatomy when you're doing surgery . . . . In review of the operative notes from December 20th, there was no mention of the ureters, that they were identified in any portion of the procedure . . . . There was mention of a small amount of bleeding or oozing that was occurring from that right side, but otherwise, by reviewing the operative note, this was an absolutely uneventful surgery and Mrs. Harper had an unfortunate complication of that surgery that was not recognized intraoperatively and it probably was not recognized intraoperatively because the care and diligence to document normal anatomy wasn't undertaken.

(Trial Tr. 131:1-24.) Dr. Duncan similarly stated in his deposition that he did not think that the ureters were properly identified because there was no indication in the operative note that identification had occurred. (Plaintiff Trial Ex. 7.)

34. However, Dr. McMurry testified that at the end of the December 20, 2005 surgery, Mrs. Harper's ureters "looked just like they did before when I started. There was no change in the ureters." (Trial Tr. 172:10-11.) When asked about why he did not put in the identification of the ureters in his operative report, Dr. McMurry explained:

> Well, I should have. I should have done it. I think everything looked normal. I did not—it was such a straightforward, uncomplicated surgery that it did not merit a long explanation that, you know, the bowel looked normal; the small intestines looked normal; the ureters looked normal; the vaginal cuff was dry; and, you know, I think that the fact that it was just a straightforward procedure is why I omitted it. I usually will include that in my note, but I didn't.

(Trial Tr. 173:7-14.) Additionally, Dr. Griffin testified that he did not think it was a deviation from the standard of care that Dr. McMurry did not put in his operative report that he identified the ureters at the end of surgery. He opined:

> You put in an operative note those things that you think are important in people taking care of patients later or in helping you remember things that important as you see the patient post-operatively. So if you looked at the ureter and you couldn't see

> it, that would be important to know . . . . It's generally expected and accepted that pelvic surgeons who are board certified know that ureter injuries are possible, that ureteral courses run close to the uterine arteries and the infunibulo pelvic ligaments and that care should be taken and is expected to be taken in looking at pelvic structures and in doing pelvic surgery . . . . [I]f you see problems that need to be identified, you put those in your operative note. Everything else is a personal choice.

(Trial Tr. 208-10.) The Court finds that Dr. McMurry did not breach the standard of care when he failed to mention the identification of the ureters in his operative report from December 20, 2005.

35. Additionally, the Court finds that the failure to include the identification in the operative report does not mean that Dr. McMurry did not identify the ureters intraoperatively. Plaintiffs have not met their burden of causation on this point. Dr. McMurry testified that he did identify the ureters at the close of surgery, and found no identifiable injury. Plaintiffs' evidence is circumstantial at best. The only evidence Plaintiffs rely on is the lack of the mention in the operative report, which is undermined by Dr. McMurry's testimony. It additionally lacks credibility because of Dr. Griffin's testimony that most ureteral injuries are not detected until after surgery.

36. Based on the foregoing, the Court is not convinced by a preponderance of the evidence that Dr. McMurry failed to identify the ureters intraoperatively.

*B. Failure Lead to Subsequent Problems*

37. Plaintiffs' also argue that Dr. McMurry was negligent because his failure to recognize Mrs. Harper's ureteral injury before the close of the December 20, 2005 surgery led to subsequent problems and surgeries for Mrs. Harper. Dr. Zaslau opined that because the injury was not identified intraoperatively, Mrs. Harper was placed at a higher rate of stricture three days later when the ureter was reimplanted. (Trial Tr. 136.) Dr. Duncan similarly stated that if the injury had been caught intraoperatively, it is possible that the ureter would have survived without the need for any further medical procedures. Further, he testified:

Q. [I]t's your opinion that she would not have lost as much of the ureter as she did three days later when they did the exploratory surgery and repaired it?

A. Even if the portion of the ureter was lost and had to be sacrificed it would have been significantly shorter than what had to be sacrificed later, so she would have not required reimplantation, a reimplantation type procedure at any time.

Q. What procedure would she have had instead of a reimplantation?

A. As I indicated, it would have been an end-to-end anastomosis and a stent would probably have been placed at that time.

Q. Basically, in layman's terms, you could take the two ends of the ureter and sew it back together?

A. Correct.

Q. So the passage of time does have an effect on the health of an injured ureter?

A. Yes. If you suture something, the tissue in the suture is typical going to necrose or die.

...

Q. You're aware of the fact that she had several procedures after the surgery on December 23rd, which was the surgery, the reimplantation, where she had stents removed and replaced on various occasions?

A. Yes, sir.

Q. Would those procedures be related to the original injury?

A. Yes.

(Plaintiff Trial Ex. 7.)

38. Dr. Zaslau's and Dr. Duncan's predictions are undermined by Defendant's expert testimony. While Dr. McMurry testified that it was possible that Mrs. Harper might not have needed reimplantation, he also said that it was possible that she still would have needed it even if the injury had been found intraoperatively. (Trial Tr. 96:17-25.) Dr. Griffin had a similar opinion and stated

that there was no way to know what would have been required had the injury been found intraoperatively. (Trial Tr. 214:15-16.)

39. The testimony elicited at trial does not establish that Dr. McMurry's failure to identify Mrs. Harper's injury intraoperatively fell below the national standard of care. There is also no causal link establishing Dr. McMurry's actions led to Mrs. Harper's subsequent problems and surgeries.

## *VI. FINAL CONCLUSIONS OF LAW*

40. Plaintiffs have not proven, by a preponderance of the evidence, that Dr. McMurry failed to identify Mrs. Harper's ureters intraoperatively, or that he breached any standard of care when he did not mention the identification in his operative report. Thus, the Court **FINDS** that Dr. McMurry did not deviate from the applicable standard of care in that regard.

41. Plaintiffs have not proven, by a preponderance of the evidence, that Dr. McMurry's actions caused Mrs. Harper's subsequent problems leading to surgery. Thus, the Court **FINDS** that Dr. McMurry did not deviate from the applicable standard of care by failing to identify the injury intraoperatively.

42. Accordingly, the Court **FINDS** that Defendant is not liable to Plaintiffs for medical negligence. Judgment will be entered for Defendant and the case will be removed from the Court's docket. A separate Judgment Order will enter this day implementing the rulings contained herein.

ENTER: September 19, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE